UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROGER WALKER,<br><br>　　　　Plaintiff<br><br>　　v.<br><br>TIM POOLE, et al.,<br><br>　　　　Defendants | CASE NO. 1:16-CV-1665 AWI-EPG<br><br>ORDER ON FINDINGS AND RECOMMENDATION AND DEFENDANT WILLOW SALOUM'S MOTION FOR SUMMARY JUDGMENT<br><br>(Doc. Nos. 112, 137) |

Plaintiff Roger Walker ("Walker") is a civil detainee proceeding pro se and in forma pauperis in this civil rights action filed pursuant to 42 U.S.C. § 1983. This case proceeds against Defendant Willow Saloum on Plaintiff's claim for failure to protect in violation of the Fourteenth Amendment. Currently pending before the Court is Saloum's motion for summary judgment. The matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302.

On July 20, 2020, the Magistrate Judge issued a Findings and Recommendation ("F&R") that recommended denying Saloum's motion in its entirety. Saloum filed timely objections to the F&R. In part, Saloum argues that Walker failed to rebut the presumption that she (Saloum) exercised professional judgment with respect to his care and safety. Walker did not reply to Saloum's objections. In accordance with the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Rule 304, this Court has conducted a de novo review of this case. Having reviewed the F&R,

Saloum's objections, and the relevant filings, the Court respectfully disagrees with the F&R. Instead, as explained below, the Court finds that Saloum is entitled to summary judgment.

*Summary Judgment Framework*

Summary judgment is proper when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004). The opposing party's evidence is to be believed, and all justifiable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Narayan v. EGL, Inc., 616 F.3d 895, 899 (9th Cir. 2010). While a "justifiable inference" need not be the most likely or the most persuasive inference, a "justifiable inference" must still be rational or reasonable. See Narayan, 616 F.3d at 899. Summary judgment may not be granted "where divergent ultimate inferences may reasonably be drawn from the undisputed facts." Fresno Motors, LLC v. Mercedes Benz USA, LLC, 771 F.3d 1119, 1125 (9th Cir. 2015).

*Background*

Ryan Wilkins was moved into Walker's dorm room in unit RU-19 if of the Coalinga State Hospital in July 2014. On February 5, 2015, Walker and Wilkins got into a fight when Wilkins blindsided Walker with a powerful blow. Walker declared that he asked Wilkins why Wilkins was acting so strange and why was Wilkins going into Walker's bed area. Wilkins became argumentative and punched Walker in the eye. Walker and Wilkins were then separated by a dorm room change but remained in RU-19. Staff met with Walker and Wilkins to find out what happened and why, and to see if a possible solution could be reached between the two. It was determined that no solution could be reached so a recommendation was made to the Program Director/Assistant that either Walker or Wilkins be moved out of RU-19. About one to two days after the February 5 fight, see Walker Depo. 57:1-7, Walker and Wilkins got into a second fight, which started after Wilkins grabbed Walker from behind. After the second incident, Wilkins was transferred out of RU-19. Wilkins and Walker are both civilly committed to Coalinga State Hospital as sexually violent predators ("SVP's") pursuant to Cal. Wel. & Inst. Code § 6600 *et seq.*

With respect to the actions of Saloum, both Saloum and Walker have submitted competing declarations.[1]

In relevant part, Saloum declares that:[2]

> After Mr. Wilkins was transferred to [Walker's] dorm room in or about 2014, [Walker] told to me he wanted to get away from Mr. Wilkins because [Wilkins] was strange and engaging in odd behavior. I specifically recall that [Walker] did not like Mr. Wilkins's hygiene habits or the fact that he talked to himself, both common symptoms of psychological illness. Every comment [Walker] made to me about Mr. Wilkins was of an interpersonal nature. He never told me he was afraid of Mr. Wilkins or that he was worried about his personal safety or of any physical altercation. Based on the information [Walker] was giving me, and consistent with DHS policy, I counseled [Walker] to use his coping skills, to talk to Mr. Wilkins, and to try and get along.
>
> Prior to the February 5, 2015 altercation, I had no professional knowledge about Mr. Wilkins's behavior in other units in DSH. The only information I recall learning about him upon his transfer into [RU-19] was that it was [an] administrative transfer because he had [been] having a sexual relationship with one or more peers in his prior unit. In my professional judgment, nothing I knew about Mr. Wilkins upon his transfer into [RU-19], and nothing [Walker] told me about his interactions with Mr. Wilkins, led me to believe there were any safety concerns or any indication that [Walker] and Mr. Wilkins would end up in a physical altercation.

Saloum Dec. ¶¶ 4, 5.

In contrast, Walker has sworn as follows:

> [I] did inform Dr. Saloum of Wilkins's strange behavior and explained to her that Wilkins and I did not get along (it was then she was placed on notice), but she deliberately ignored my request to be separated and then she proceeded to coerce [me] and minimize the danger by telling [me] to use [my] coping skills and talk more with Wilkins and try to get along with him. [Saloum] manipulated and placed [me] further in danger. At one point in our conversation, she even suggested that [I] help Wilkins clean his area and help him clean the gook off the door. Willow Saloum was very callous and insensitive to [my] request to be moved to another dorm. And that is what led to [me] being brutally assaulted [by Wilkins].
>
> [I] informed Saloum more than once, several times that [I] wanted to get away from Wilkins but Saloum blatantly ignored that request. Wilkins's odd behavior consisted of staring at [me] while he masturbated, [I] knew that Wilkins was sexually attracted to [me] and let it be known to Saloum that [I] was homophobic, [I] also let it be known to Wilkins and that [is] when Wilkins became angry and hostile and more threatening.
> ….

---

[1] Walker's sworn version of events consists of a response to Saloum's proposed undisputed facts and Walker's own statement of undisputed facts, which are all sworn under penalty of perjury.

[2] Saloum has a Doctor of Psychology degree and at the relevant time, she worked as a Licensed Clinical Psychologist at the Coaling State Hospital; she was the psychologist for unit RU-19. See Saloum Decl. ¶¶ 2, 3. As a unit psychologist, Saloum did not have authority to transfer patients between rooms or between units. See id. at ¶ 6.

3

> [I] explained to Dr. Saloum that "weird," by stating [Wilkins's] M.O. That Mr. Wilkins is sexually attracted to black men like myself. And [Wilkins] has violent confrontations with his personal affixations. I specifically told Dr. Saloum that [Wilkins's] weird conduct became a shoving match because he stares while watching me, as if he's in a trance. The worst situation was like I described to her, waking up in the middle of the night, and Mr. Wilkins standing over my bed groping himself. Saloum admits that [I] had spoken to her in the past concerning [Wilkins's] weirdness.

Doc. No. 120, pp. 3, 9.

*Legal Standard*

"Involuntarily committed patients in state mental health hospitals have a Fourteenth Amendment due process right to be provided safe conditions by the hospital administrators." Mitchell v. Washington, 818 F.3d 436, 443 (9th Cir. 2016); Ammons v. Washington Dep't of Soc. & Health Servs., 648 F.3d 1020, 1027 (9th Cir. 2011). Whether a hospital professional has violated a detainee's due process right to safe conditions depends on whether and to what degree the professional's judgment diverges from that of a reasonable professional. See Youngberg v. Romeo, 457 U.S. 307, 321-22 (1982); Mitchell, 818 F.3d at 443; Ammons, 648 F.3d at 1027. A decision, if made by a professional, "is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Youngberg, 457 U.S. at 322; Mitchell, 818 F.3d at 443; Houghton v. South, 965 F.2d 1532, 1536 (9th Cir. 1992). This standard is referred to as the "*Youngberg* professional judgment standard." Mitchell, 818 F.3d at 443. The *Youngberg* professional judgment standard is "equivalent to that required in ordinary tort cases for a finding of conscious indifference amounting to gross negligence." Houghton, 965 F.2d at 1536; Estate of Conners v. O'Connor, 846 F.2d 1205, 1208 (9th Cir. 1988). Bare negligence, i.e. a professional's mere failure to exercise the level of care expected of other professionals in the same field, will not meet the *Youngberg* professional judgment standard. Estate of Conners, 846 F.2d at 1208. Courts may not substitute their own views for those of professionals and must restrict a *Youngberg* inquiry to two questions: (1) whether the decisionmaker is a qualified professional entitled to deference, and (2) whether the decision reflects a conscious indifference amounting to gross

negligence, so as to demonstrate that the decision was not based upon professional judgment. Houghton, 965 F.2d at 1536.

*Discussion*

The decision at issue is the decision by Saloum to counsel Walker to use coping skills and to talk to or try to get along with Wilkins with respect to Wilkins's strange behavior, instead of taking steps to transfer Wilkins or otherwise protect Walker from Wilkins. A "professional decisionmaker" is "a person competent, whether by education, training, or experienced, to make the particular decision at issue." Youngberg, 457 U.S. at 323 n.30; Houghton, 965 F.2d at 1537. There is no genuine dispute that Saloum could not have unilaterally transferred either Wilkins or Walker. However, as the F&R correctly notes, Saloum could have taken steps as the unit psychologist to at least raise the possibility of a transfer with appropriate officials in order to protect Walker.[3] See Doc. No. 137 at 16:8-17. In other words, Saloum could have taken some steps to attempt to protect Walker from Wilkins. See id. Additionally, Saloum is a Doctor of Psychology and was the unit psychologist of RU-19 at all relevant times. As the RU-19 psychologist, the Court concludes that Saloum is qualified by reason of her education and training to assess the statements made by Walker and decide whether to take affirmative "protective steps" or to counsel Walker to use coping skills, talk to Wilkins, and attempt to get along with Wilkins. See Youngberg, 457 U.S. at 323 at n.30; Houghton, 965 F.2d at 1537. Because Saloum is a qualified professional, the *Youngberg* professional judgment standard applies. Further, as a qualified professional, Saloum's decision is presumed to be valid. See Youngberg, 457 U.S. at 322; Mitchell, 818 F.3d at 443; Houghton, 965 F.2d at 1536.

As indicated by the F&R, Walker's opposition indicates that Saloum was grossly negligent because Walker told Saloum that he did not get along with Wilkins, that Wilkins was "strange" or "weird," Wilkins was sexually attracted to black men like Walker, and that Wilkins has violent confrontations with his personal fixations. See Doc. No. 137 at 15:18-24. Wilkins informed Saloum of an instance in which Walker woke one evening to find Wilkins groping

---

[3] The Court notes that the transfer process appears to have been initiated by other hospital staff following Wilkins's attack of Walker on February 5. However, before the transfer could occur, Walker was attacked a second time.

1  himself/masturbating and an instance in which Wilkins's conduct led to a shoving match with
2  Walker because Wilkins was staring at Walker. See id. at 15:24-16:2. Walker also complained
3  about Wilkins talking to himself and having poor hygiene and being messy. See Saloum Dec. ¶ 4.

4        The Court notes that Walker's opposition does not clearly and expressly state that he told
5  Saloum that he believed that he would be physically assaulted by Wilkins, that he was afraid that
6  he would be hurt by Wilkins, or that he believed that a physical confrontation would occur with
7  Wilkins. Nevertheless, what is particularly concerning is the representation by Walker that he told
8  Saloum that a "shoving match" had occurred between himself and Wilkins. Walker's
9  representation is directly contrary to Saloum's declaration that Walker did not inform her about a
10 physical altercation and she had no indications that Wilkins would end up in a physical altercation
11 with Walker. Cf. Saloum Dec. ¶¶ 4, 5. If a shoving match had occurred prior to February 5, 2015,
12 that is a form of a physical altercation and would clearly indicate that further physical altercations
13 could occur. In the Court's view, if Walker informed Saloum of a pre-February 5 shoving match
14 because of Wilkins's "strangeness," the basis of Saloum's conclusions and actions would be
15 sufficiently undermined that a jury could find "gross negligence"/a violation of the *Youngberg*
16 professional judgment standard.

17       However, the F&R noted that Saloum objected to aspects of Walker's sworn opposition as
18 a "sham," although particular portions of a transcript were not identified. The F&R then noted
19 that there may be a contradiction regarding Walker's declaration about the pre-February 5 shoving
20 match and Walker's deposition in which he testified that there had been no pre-February 5 fights
21 with Wilkins. See Doc. No. 137 at 17 n.11. Ultimately, the F&R made no conclusion whether the
22 declaration was a sham because striking the representation about the "shoving match" would not
23 change the result, given the other allegations in Walker's sworn opposition. See id.

24       The general rule is that "a party cannot create an issue of fact by an affidavit contradicting
25 prior deposition testimony." Yeager v. Bowlin, 693 F.3d 1076, 1080 (9th Cir. 2012); Van Asdale
26 v. International Game Tech., 577 F.3d 989, 998 (9th Cir. 2009). The "sham affidavit rule"
27 prevents is meant to protect the utility of summary judgment as a procedure from screening out
28 "sham issues of fact." Yeager, 693 F.3d at 1080; Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262,

6

266 (9th Cir. 1991).  To trigger the sham affidavit rule, a court first must make a factual determination that the contradiction is a sham and second the inconsistency between the deposition and subsequent affidavit must be clear and unambiguous to justify striking the affidavit.  Yeager, 693 F.3d at1080; Van Asdale, 577 F.3d at 998.  However, "newly remembered facts, or new facts, accompanied by a reasonable explanation, should not ordinarily lead to the striking of a declaration as a sham."  Yeager, 693 F.3d at 1081.  Further, a party is "not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition and minor inconsistencies that result from honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit."  Van Asdale, 577 F.3d at 998.

      Here, the following exchange occurred at Walker's deposition:

> Q:    From the time [Wilkins] was moved into your dorm until the incident in February, was there any other prior fight between the two of you, physical?
>
> A:    No.  I don't know what happened.  I tried to talk to him, but he seemed like – it was some complex he had about me, you know, telling him what to do.  He had this attitude like as if he knew more or – you know, I don't know.  It's just strange.  It's strange. . . .

Walker Depo. 24:11-19.  The question is asking about any physical fights between Walker and Wilkins prior to the February 5 attack by Wilkins.  Walker answered "no."  There is no clarification or explanation, and definitely no mention of the shoving match referenced in Walker's sworn opposition.  A shoving match is understood to mean "two people angrily shoving each other."[4]  Two people who are angrily shoving each other are engaging in a form of physical fighting.  Walker and Wilkins angrily shoving each other prior to February 5 (because Wilkins had been staring at Walker) is inconsistent with and contrary to the deposition testimony that there had been no physical fights between Walker and Wilkins prior to February 5.

      The Court finds that the contradiction between Walker's deposition and his declaration regarding the pre-February 5 shoving match is sufficient to be considered a sham and sufficiently

---

[4] See https://www.merriam-webster.com/dictionary/shoving%20match

7

1 unambiguous to justify striking references to the shoving match as a sham.  See Yeager, 693 F.3d
2 at1080; Van Asdale, 577 F.3d at 998.  Therefore, the Court disregards the portion of Walker's
3 declaration that mentions the pre-February 5 shoving match.[5]

4       Without evidence that Wilkins and Walker had engaged in a shoving match, there is no
5 evidence of any physical conflicts or interactions between Wilkins and Walker that would have
6 clearly alerted Saloum to the danger of a fight between Wilkins and Walker.  Rather, what remain
7 are complaints by Walker that appear to be of an interpersonal nature, mainly that Wilkins was
8 strange or weird.  Saloum's declaration explains that she considered what Walker was telling her
9 and did not see a danger of physical altercations, and that attempting to use coping skills, Walker
10 attempt to talk to Wilkins, or attempting to get along with Wilkins was appropriate and consistent
11 with hospital policy.  Saloum's declaration indicates that she used her judgment as a professional
12 psychologist to determine that Walker was not in danger based on what Walker was telling her.

13       Admittedly, the Court from a lay perspective is concerned about the allegation that Wilkins
14 one time stared at Walker at night while he (Wilkins) groped himself/masturbated.  However,
15 Wilkins and Walker are both patients at the Coalinga State Hospital because they are SVP's under
16 California law.  The Ninth Circuit has recognized that, "unlike the plaintiff in *Youngberg* who was
17 civilly committed because of mental infirmities, SVPs have been civilly committed subsequent to
18 criminal convictions and *have been adjudged to pose a danger to the health and safety of others*.
19 Therefore, the rights of SVPs may not necessarily be coexistensive with those of all other civilly
20 detained persons."  Hydrick v. Hunter, 500 F.3d 978, 990 (9th Cir. 2007) (emphasis added).
21 Pursuant to their SVP status, Walker and Wilkins are both inherently dangerous.  However, they
22 are also entitled to mental health treatment, to certain degrees of freedom, to safety, and to
23 appropriate living conditions.  Walker's statements to Saloum must be considered within the SVP
24 context, including the obligations of Coalinga State Hospital to its involuntarily committed

---

[5] The Court notes that Walker did not respond to the objection that his declaration was a sham and did not respond to the F&R's note that there was a potential conflict between his declaration and his deposition testimony.  Further, Walker is pro se and was not ordered to respond to Saloum's objection of a "sham" affidavit.  Given these considerations, if Walker believes that he can demonstrate that his representation regarding the pre-February 5 shoving match is not a sham as envisioned by *Yeager* and *Van Asdale*, then Walker may file a motion for reconsideration with the Court that demonstrates his declaration is not a sham.

patients. For the Court to conclude that the remainder of what Walker told Saloum would be sufficient to justify a finding of gross negligence, the Court would need additional information regarding the appropriate psychological standards of care, particularly when two SVP's are involved. Otherwise, the Court and a trier of fact would be speculating as to what a reasonable psychologist would have done in Saloum's position or the degree to which Saloum's conduct deviated from the appropriate standard of care applicable to psychologists. Cf. Estate of Conners, 846 F.2d at 1208 (noting that bare negligence, which is a professional's mere failure to exercise the level of care expected of other professionals in the same field, will not meet the *Youngberg* professional judgment standard). In the absence of some evidence regarding appropriate psychological standards for evaluating threats or statements by a mental health patient, the Court cannot find sufficient support for a conclusion that Saloum's evaluation of Walker's statements, her advice to Walker, and her decision not to take other steps to protect Walker from Wilkins amounted to gross negligence.[6] That is, Walker has failed to sufficiently rebut the presumption that Saloum exercised professional judgment.

The F&R concluded that, without evidence that Walker informed Saloum of a pre-February 5 shoving match, Walker's remaining evidence was still sufficient for a reasonable trier of fact to find gross negligence by Saloum. As explained above, the Court has reached the opposite conclusion. Therefore, the Court respectfully declines to adopt the F&R with respect to Saloum's motion for summary judgment. Instead, because Walker has not sufficiently rebutted the presumption that Saloum exercised professional judgment, the Court will sustain Saloum's objections, grant Saloum's motion for summary judgment, and close this case.

---

[6] To be clear, the Court is not holding that a *Youngberg* plaintiff must present expert testimony to show a sufficiently egregious breach of the standard of care in every case. However, Saloum is not a typical administrator. Her alleged failure necessarily entails a failure to properly evaluate the complaints made by Walker in a psychologist-patient setting within Coalinga State Hospital. Given the remainder of what Walker told to Saloum, this is not a situation where Saloum's failure would be obvious to a lay person. Cf. Ammons, 648 F.3d at 1032-35 (finding an administrator, who was not providing any mental or physical care, could be found grossly negligent for failing to keep a male orderly and a minor female plaintiff apart where the patient and orderly were suspected and showing signs of having an unlawful romantic relationship); accord Ewing v. Northridge Hosp. Med. Ctr., 120 Cal.App.4th 1289, 1302-03 (2004) (applying California tort law and explaining that expert testimony is generally required to establish a health care practitioner's breach of the professional standard of care unless the health care practitioner's "misfeasance is sufficiently obvious as to fall within the common knowledge of laypersons."). Therefore, some evidence regarding the standard of care or what a reasonable psychologist would have done in Saloum's position is necessary.

**ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1. To the extent in Court DECLINES to adopt the July 20, 2020, Findings and Recommendation (Doc. No. 137) with respect to Defendant Saloum's motion for summary judgment;
2. Defendant's Saloum's motion for summary judgment (Doc. No. 112) is GRANTED; and
3. The Clerk shall CLOSE this case.

IT IS SO ORDERED.

Dated: November 24, 2020

SENIOR DISTRICT JUDGE